# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **LONNELL WRIGHT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No. 3:03-0839** |
| **v.** | ) | **Judge Wiseman / Knowles** |
| | ) | |
| **JO ANNE BARNHART,** | ) | |
| **Commissioner of Social Security** | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security which found that Plaintiff was not disabled and which denied Plaintiff Supplemental Security Income ("SSI") Benefits, as provided under Title XVI of the Social Security Act, as amended. The case is currently pending on Plaintiff's "Brief."[1] Docket Entry No. 14. Defendant has filed a "Response to Plaintiff's Motion for Judgment on the Administrative Record." Docket Entry No. 15. Defendant argues in part that the decision of the Commissioner was supported by substantial evidence and should be affirmed. *Id.*

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

---

[1]The Court will construe Plaintiff's "Brief" as a Motion for Judgment on the Administrative Record.

Case 3:03-cv-00839   Document 16   Filed 07/11/05   Page 1 of 25 PageID #: 1

# I.  INTRODUCTION

Plaintiff began receiving SSI payments on March 8, 1996, because he was found to be disabled with Attention Deficit Hyperactivity Disorder ("ADHD") and a learning problem.  TR 96.  Plaintiff's impairments were found to functionally equal a listed impairment.  *Id.*  Because Plaintiff was then a minor, Plaintiff's mother filed an "Application Update" for SSI Benefits on his behalf on January 23, 1998.  Docket Number 12, Attachment ("TR"), pp. 121-133.  The Social Security Administration began a Continuing Disability Review ("CDR") on January 13, 2001, to determine whether Plaintiff's disability persisted.  TR 81-82.  On April 20, 2001, the Social Security Administration determined that Plaintiff's condition had improved over time, and that he was no longer disabled and eligible to receive SSI payments.  TR 78-79; 83-86.  On May 1, 2001, Plaintiff's mother opted to continue receiving benefits while she pursued an appeal of the SSA's decision.  TR 87-88.

On May 1, 2001, Plaintiff's mother filed a "Request for Reconsideration - Disability Cessation" on Plaintiff's behalf and indicated that she wished to appear at Plaintiff's disability hearing.  TR 89-90.  A disability hearing was conducted on October 24, 2001, by Disability Hearing Officer ("DHO") Judy Faulkner.  TR 94-95.  At the hearing, Plaintiff's mother acted as his representative.  TR 95.  Plaintiff and his sister, Angie Fitzpatrick, appeared and testified.  TR 95-97.

On December 18, 2001, the DHO issued a decision unfavorable to Plaintiff, finding that Plaintiff's disability had ceased in April 2001, and that Plaintiff's eligibility had terminated as of June 2001.  TR 80.

Plaintiff subsequently requested (TR 105-106) and received (TR 29-32) an administrative

2

hearing. Plaintiff's hearing was conducted on February 11, 2003, by Administrative Law Judge

("ALJ") Mack H. Cherry. TR 40. At the hearing, Plaintiff waived his right to legal

representation. TR 16. Plaintiff and his mother, Rosetta Wright, appeared and testified. *Id.*

Also appearing and testifying at Plaintiff's hearing were Plaintiff's sister, Angela Fitzpatrick;

Plaintiff's brother, Donnell Wright; and Vocational Expert ("VE"), Jane Brenton. TR 40-41.

On May 23, 2003, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was no longer disabled within the meaning of the Social Security Act and Regulations.

TR 12-21. Specifically, the ALJ made the following findings of fact:

1.  The claimant has not engaged in any substantial gainful activity since April 2001.

2.  There was medical improvement in the claimant's condition by April 2001.

3.  The claimant continues to have a severe combination of impairments, including a learning disability in reading and written language, a healed ankle fracture, depression, and an attention deficit hyperactivity disorder in remission.

4.  Since April 2001, the claimant has not had any impairment or combination of impairments which has met or medically equaled the level of severity of an impairment found in 20 CFR Part 404, Subpart P, Appendix 1.

5.  During the period of April 2001 and October 2002, when he attained age 18, the claimant did not have any impairment or combination of impairments functionally equivalent in severity to any impairment found in 20 CFR Part 404, Subpart P, Appendix 1.

6.  The claimant possesses the capacity to perform work at all exertional levels that does not involve climbing ladders or working at heights and allows for moderate limitations in his ability to understand, remember, and carry out detailed job instructions, to function independently, to maintain concentration and attention for extended periods of time,

and to adapt to changes in a work environment.

7.      The claimant does not have any vocationally relevant past
        work experience.

8.      The claimant attained age 18 in October 2002, and is a
        younger individual.  20 CFR 416.963.

9.      The claimant is literate and has a limited education.  20
        CFR 416.964.

10.     The claimant does not possess any transferable job skills.
        20 CFR 416.968.

11.     If the claimant's nonexertional limitations did not
        significantly compromise his ability to perform work at all
        exertional levels since attaining age 18 in October 2002,
        section 204.00, Appendix 2, Subpart P, Regulations No. 4
        indicates that a finding of not disabled would be
        appropriate.  Since his capacity to work at all exertional
        levels is compromised by nonexertional limitations, the
        remaining work that he is functionally capable of
        performing must be considered in combination with his
        age, education, and work experience to determine whether
        a work adjustment can be made.

12.     Considering the types of work that the claimant is
        functionally capable of performing, in combination with his
        age, education, and work experience, he can be expected to
        make a vocational adjustment to work which exists in the
        national economy.  Examples of such jobs are janitor, hand
        packer, and dishwasher.  There are about 93,000 of the
        named sample jobs in existence in Tennessee; a significant
        number of jobs.

13.     The claimant's disability ceased as of April 2001 and he
        has not been under a "disability," as defined in the Social
        Security Act, since that time.  20 CFR 416.994a and
        416.920(f).

TR 20-21.

        On June 18, 2003, Plaintiff timely filed a request for review of the ALJ's hearing

4

decision.  TR 10-11.  On July 31, 2003, the Appeals Council issued a letter declining to review

the case (TR 6-8), thereby rendering the decision of the ALJ the final decision of the

Commissioner.  This civil action was thereafter timely filed, and the Court has jurisdiction.  42

U.S.C. § 405(g).  If the Commissioner's findings are supported by substantial evidence, based

upon the record as a whole, then these findings are conclusive.  *Id.*

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to Attention Deficit Hyperactivity Disorder ("ADHD") and

a learning problem.  TR 96.

Records were obtained from Green Hills Children's Clinic dated August 23, 1988

through August 22, 2001.[2]  TR 278-293.

Emergency room records were obtained from Vanderbilt University Medical Center

dated April 20, 1992.[3]  TR 300-301.

Prescriptions for Ritalin and/or Dexadrine were submitted, dated September 29, 1991

through May 1, 1998.  TR 316; 319-329.

On November 22, 1995, Plaintiff reported to the Green Hills Children's Clinic,

complaining of nervousness and stomach aches caused by Ritalin.  TR 291.

On March 19, 1996, Plaintiff returned to the Green Hills Children's Clinic, and his record

notes that Plaintiff was having behavior problems at home.  TR 291.

In Plaintiff's record from Green Hills Children's Clinic from July 7, 1998, it was once

---

[2]Many of these records are illegible.

[3]These records are illegible.

5

again noted that Plaintiff had ADHD. TR 287.

Dr. Michael A. Bottari conducted a psychoeducational evaluation of Plaintiff on January 25, 2001. TR 134-137. Dr. Bottari noted that Plaintiff was diagnosed with ADHD in the fifth grade, and that he had been treated with Dexedrine. TR 134. Dr. Bottari noted that Plaintiff was taking special education classes, and described Plaintiff's grades as "excellent" and "solid." *Id.* Dr. Bottari further noted that there was no report of behavioral problems. *Id.* Dr. Bottari administered the "WISC-III" test to Plaintiff. TR 135. Plaintiff's results were a verbal I.Q. of 94, a performance I.Q. of 89, and a full-scale I.Q. of 91. *Id.* Dr. Bottari also administered the Woodcock-Johnson test. TR 136. On this test, Plaintiff achieved a broad reading score of 73, a broad math score of 94, and a broad written language score of 69. *Id.*

On January 29, 2001, Plaintiff's mother had a conference with one of the doctors from Green Hills Children's Clinic. TR 280. The records from this meeting indicated that Plaintiff had not taken medication for ADHD since 1998, that there was no difference in his school performance, and that Plaintiff reported feeling frustrated. *Id.*

Dr. Karen B. Lawrence completed a Childhood Disability Evaluation Form on April 11, 2001. TR 250-255. Dr. Lawrence opined that Plaintiff's impairments were severe, but that they did not "meet, medically equal, or functionally equal the listings." TR 250. Dr. Lawrence opined that Plaintiff had a "less than marked" degree of limitation in his ability to acquire and use information, to attend and complete tasks, and to care for himself. TR 252-253. Dr. Lawrence further opined that Plaintiff had "no limitation" in his ability to interact and relate with others and to move and manipulate objects. *Id.* Dr. Lawrence also noted that Plaintiff had "no limitation" in his health and physical well-being. TR 253. On April 11, 2001, Dr. Lawrence

6

completed an Analysis of Medical Improvement Issues, in which she opined that Plaintiff demonstrated "[s]ignificant" medical improvement. TR 256-257.

Dr. Denise Bell completed a Childhood Disability Evaluation Form on April 20, 2001. TR 258-263. Dr. Bell opined that Plaintiff's impairments were severe, but that they did not "meet, medically equal, or functionally equal the listings." TR 258. Dr. Bell opined that Plaintiff had a "less than marked" degree of limitation in his ability to acquire and use information, to attend and complete tasks, and to care for himself. TR 260-261. Dr. Bell further opined that Plaintiff had "no limitation" in his ability to interact and relate with others and to move and manipulate objects. *Id.* Dr. Bell reported that Plaintiff had "no limitation" in his health and physical well-being. TR 261. Dr. Bell also partially completed an Analysis of Medical Improvement on April 20, 2001, but she did not indicate whether or not Plaintiff demonstrated medical improvement. TR 264-265.

Dr. Sharon Moore-Caldwell wrote a letter regarding Plaintiff on May 10, 2001. TR 311. In her letter, Dr. Caldwell stated that Plaintiff had been previously diagnosed with ADHD, that he had been treated with the prescription drug Adderall, and that Plaintiff stopped taking this medication because of irritability and stomach aches. *Id.*

On May 15, 2001, Dr. George W. Livingston completed an analysis form regarding Plaintiff, indicating that additional development of the record was needed for him to make a determination regarding Plaintiff. TR 266.

Dr. Thomas L. Pettigrew conducted a psychological evaluation of Plaintiff on June 25, 2001. TR 267-269. Plaintiff reported that he had not taken Ritalin since he was in seventh or eighth grade. TR 268. Dr. Pettigrew reported that Plaintiff told him, "[t]hat [his] (ADHD) has

toned down a lot. It ain't really no problem now." *Id.* Plaintiff reported getting along well with peers, teachers, and members of his community. *Id.* Plaintiff denied any history of behavioral problems in school, at home, or in the community. *Id.* Plaintiff reported that he enjoyed school, and that he anticipated going to vocational school after graduation. *Id.* Dr. Pettigrew noted that Plaintiff's mental status examination was consistent with previous testing that documented Plaintiff's global intelligence functioning at the "lower end" of the average range of intelligence. *Id.* Dr. Pettigrew's "Axis I" diagnostic impression of Plaintiff was, "[r]eported history of ADHD, currently in remission, DSM-IV 314.01." TR 269. Dr. Pettigrew did not make an "Axis II" diagnosis. *Id.* Dr. Pettigrew also noted that Plaintiff functioned within the average range of intelligence, and that he was able to effectively understand, remember, and carry out simple verbal instructions. *Id.* Dr. Pettigrew opined that Plaintiff's attention, concentration, memory, and verbal expressive skills appeared to be within the average range. *Id.*

Dr. Livingston completed a Childhood Disability Evaluation Form regarding Plaintiff on July 12, 2001. Dr. Livingston opined that Plaintiff's impairments were severe, but that they did not "meet, medically equal, or functionally equal the listings." TR 270. Dr. Livingston opined that Plaintiff had "no limitation" in his ability to attend and complete tasks, to interact and relate with others, to move and manipulate objects, and to care for himself. TR 272-273. Dr. Livingston further opined that Plaintiff had a "less than marked" degree of limitation in his ability to acquire and use information. TR 272. Dr. Livingston noted that Plaintiff had "no limitation" with regard to his health and physical well-being. TR 273. Dr. Livingston also completed an Analysis of Medical Improvement Issues form on July 12, 2001. TR 276-277. Dr. Livingston noted that Plaintiff demonstrated "significant" medical improvement. TR 277.

8

Plaintiff returned to the Green Hills Children's Clinic on August 22, 2001. TR 278. Plaintiff's medical records from this date indicated that Plaintiff had not taken Ritalin since 1998. *Id.*

Dr. Clifford Robinson conducted a psychiatric evaluation of Plaintiff on January 28, 2002. TR 336-337. Plaintiff complained of trouble reading and memorizing things, and stated that he could not remember instructions given to him. TR 336. Plaintiff told Dr. Robinson that he was in special classes in school because of poor reading comprehension, and that he did not think the classes were challenging enough. *Id.* Dr. Robinson noted that Plaintiff's teachers had stated that he had had ADHD in the past, but that it was then-currently in remission. *Id.* Plaintiff's mother reported that Plaintiff had become more irritable and that he had very poor concentration. *Id.* Dr. Robinson's impressions were: "[m]ajor depressive disorder," "[l]earning disorder not otherwise specified," "[a]cademic problems," and a Global Assessment of Functioning ("GAF") of "40, 60." TR 337.

On February 27, 2002, Plaintiff returned to Dr. Robinson, who noted that Plaintiff was "doing better." TR 335.

Plaintiff went to the emergency room at St. Thomas Hospital on May 30, 2002, complaining of pain and swelling in his right ankle after a fall. TR 302. An x-ray of Plaintiff's ankle showed a "minimally displaced distal fibula fracture." *Id.* Dr. Paul Bergeron examined Plaintiff and advised ankle surgery, but Plaintiff's mother declined surgery and instead stated that she would prefer conservative splinting and re-assessment of Plaintiff's ankle, citing "her Jehovah's Witness faith." *Id.* Dr. Bergeron's impression was, "[c]losed right distal fibula fracture with probable ligamentous disruption of the ankle as well." TR 303. Dr. Bergeron

9

recommended that Plaintiff ice and elevate his ankle, gave Plaintiff crutches, and advised Plaintiff to maintain ankle immobilization at all times. *Id.*

Dr. Frank Hardf of Green Hills Children's Clinic completed a Childhood Disability Evaluation Form regarding Plaintiff on September 12, 2002. TR 307-308. Dr. Hardf opined that Plaintiff had no evidence of limitation of his motor skills. TR 307. Dr. Hardf further opined that Plaintiff had a "less than marked" degree of limitation in his communicative skills, cognitive skills, social skills, and personal skills. *Id.* Dr. Hardf also opined that Plaintiff had a "marked" degree of limitation in his functions of concentration, persistence, and pace. *Id.* Dr. Hardf noted that Plaintiff demonstrated "marked degrees of ADD made by observation at school and previously by teachers, physicians, and psychiatry." TR 308. Dr. Hardf additionally noted that Plaintiff had a learning disability. *Id.*

Dr. Robinson completed a Childhood Disability Evaluation Form regarding Plaintiff on October 2, 2002. TR 298-299. Dr. Robinson opined that Plaintiff showed no evidence of limitation in his motor skills, responsiveness to stimuli, and personal functions. TR 298. Dr. Robinson further opined that Plaintiff showed "less than marked" limitation in his cognitive skills, communicative skills, and social skills. *Id.* Finally, Dr. Robinson noted that Plaintiff had a "marked" degree of limitation in his functions of concentration, persistence, and pace. *Id.*

Dr. Robinson completed a Childhood Disability Evaluation Form regarding Plaintiff on November 18, 2002. TR 330-331. Dr. Robinson opined that Plaintiff showed no evidence of limitation in his motor skills. TR 330. Dr. Robinson further opined that Plaintiff showed "less than marked" limitation in his cognitive skills, communicative skills, social skills, and responsiveness to stimuli. *Id.*

Cheri Grieve, M.S., L.P.E., conducted a psychological examination of Plaintiff on March 31, 2003. TR 344-348. Plaintiff reported that he had started feeling depressed when he was in the tenth grade, that he was taking Zoloft, and that he had not had problems with depression for four to five months. TR 344. Plaintiff reported that he felt "super-depressed" if he did not take his medication. *Id.* Plaintiff stated that he had some friends with whom he went to the mall, movies, and bowling, and with whom he played sports. *Id.* Plaintiff reported that he wore glasses to help him see at a distance. TR 345. Plaintiff told Ms. Grieve that he was to graduate in May of that year with a regular high school diploma. *Id.* Ms. Grieve noted that Plaintiff reported receiving A's, B's, and some C's in high school. *Id.* Plaintiff denied having behavior problems at school. *Id.* Plaintiff stated that he had never worked for pay, but that he had done volunteer work. *Id.* Ms. Grieve noted that Plaintiff demonstrated some deficit in short-term memory, but that his mental status was "not significantly altered." TR 346.

Ms. Grieve administered the "WAIS-III" test to Plaintiff. TR 347. Plaintiff's I.Q. scores were a verbal I.Q. score of 90, a performance I.Q. score of 90, and a full-scale I.Q. score of 91. *Id.* Ms. Grieve noted that Plaintiff's I.Q. scores were in the average range. *Id.* Ms. Grieve also administered the "WJ-R" test to Plaintiff, noting that Plaintiff showed "relative strength" in broad math skills, but that he showed a "normative weakness" in his broad reading skills. *Id.* Ms. Grieve opined that Plaintiff had a reading disorder. *Id.* Ms. Grieve's diagnostic impressions included: a reading disorder, a dysthemic disorder, academic difficulties, and a GAF score of 64. TR 348.

### B. Plaintiff's Testimony

Plaintiff testified that he lived at home with his mother and his brother. TR 43. Plaintiff

further testified that he had a driver's license, and that he was in the twelfth grade at Maplewood High School.  TR 43-44.

Plaintiff reported that he had never worked for an income.  TR 44.  Plaintiff stated that his courses in school included web page design, "auto tech," and mainstream English.  TR 44.  Plaintiff added that he needed to pass the "tee cap" examination for English.  *Id.*

Plaintiff testified that he took an antidepressant, but that he could not recall the name of the medication.  TR 44.

Plaintiff reported that he had attention deficit disorder, and that concentration was still a problem for him.  TR 44.  Plaintiff explained that people would tell him to do things and that he would forget the instructions.  TR 44-45.  Plaintiff added that if he had to read something, he normally had to read it two or three times before he understood it.  TR 45.

Plaintiff stated that his grades in school were "mainly A's and B's," and that he did not play sports.  TR 45.  Plaintiff reported that he played tuba in the band his freshman year, but that he was not in the band anymore.  *Id.*  Plaintiff explained that he quit the band because he did not have time for it.  *Id.*  Plaintiff testified that he lifted weights.  *Id.*

Plaintiff reported that he had broken his ankle about eight months previously while chasing his dog.  TR 46.  Plaintiff stated that his ankle continued to ache whenever the weather was cold, and that he sometimes had pain and swelling.  *Id.*

Plaintiff testified that he wore glasses.  TR 46.  The ALJ asked Plaintiff whether the glasses corrected his vision.  *Id.*  Plaintiff did not give an audible answer, but the ALJ's response indicates that Plaintiff testified that the glasses corrected his vision problem.  *Id.*  Plaintiff added that he did not usually hold on to his glasses for long because he would lose or break them.  TR

12

47. Plaintiff added that he was then-currently wearing contacts, and that he needed glasses in order to read or see at a distance. *Id.*

Plaintiff reported that he never received physical therapy for his ankle. TR 47. Plaintiff stated that initially, his doctors had not operated on his ankle, but that he underwent surgery after his ankle failed to heal properly. *Id.* Plaintiff stated that he had to walk on crutches for four to five months. *Id.* Plaintiff added that he occasionally wore an ankle brace when his ankle hurt. TR 48. Plaintiff testified that his ability to walk distances varied according to whether or not his ankle hurt. *Id.*

Plaintiff testified that he still lifted weights, and that he occasionally did chores around the house. TR 48. Plaintiff added that he sometimes forgot to do his chores. *Id.*

Plaintiff testified that he had recently dated, and that he went to movies. TR 48-49. Plaintiff added that his hobbies included collecting games and videos. TR 49. Plaintiff added that he "cut" his yard. *Id.*

Plaintiff testified that he had problems paying attention. TR 49. Plaintiff stated that his medications did not have side effects. *Id.* Plaintiff also reported that he did a "substantial amount of driving," and that he went to the mall on the weekends. *Id.*

Plaintiff reported that his disability checks went to his mother, and that she took care of the finances. TR 49-50.

### C. Testimony of Plaintiff's Mother

Plaintiff's mother, Rosetta Wright, testified that she had reviewed Plaintiff's records, and that she thought that some of them referred to Plaintiff's twin brother. TR 50. Ms. Wright testified that she was not sure which records referred to Plaintiff's brother. TR 51. Ms. Wright

added that she did not object to any of the exhibits.  *Id.*

Ms. Wright testified that she handled Plaintiff's finances and business affairs.  TR 51-52.

Ms. Wright reported that Plaintiff had problems with his vision, and that Plaintiff had attention deficit disorder and a learning disability.  TR 52.  Ms. Wright added that Plaintiff's main problem was that he would forget things that people told him.  *Id.*

Ms. Wright stated that Plaintiff was taking the antidepressant Lexapro, and that this medicine was prescribed by Dr. Roberson.[4]  TR 52.  Ms. Wright reported that Dr. Roberson told her that Plaintiff's medication was for major depression.  *Id.*  Ms. Wright added that Plaintiff had been under a lot of pressure at school and that his classmates had been picking on him.  *Id.*

Ms. Wright reported that Plaintiff's depression made him moody and irritable.  TR 53. She added that Plaintiff "gets in a mood where he don't want to be bothered with nobody."  *Id.* Ms. Wright reported that Plaintiff daydreamed and that his mind wandered.  *Id.*  Ms. Wright added that sometimes it was hard for her to get Plaintiff up and get him to go to school.  *Id.*

Ms. Wright testified that she had three children, and that one of her other children "has some of the same thing."  TR 53.  Ms. Wright added that her other child who experienced Plaintiff's symptoms, Plaintiff's twin brother, was "not as bad" as Plaintiff.  TR 54.  Specifically, Ms. Wright stated that Plaintiff's "processing part" was worse than his brother's.  *Id.*

Ms. Wright stated that she thought Plaintiff would have "a great problem" working.  TR 54.  Ms. Wright added that if Plaintiff went to work, his co-workers would need to be informed of Plaintiff's disability because his disability made him angry.  *Id.*  Ms. Wright expressed

---

[4]Although the hearing transcript references a "Dr. Roberson," it is possible that the hearing transcript mistakenly referred to Dr. Robinson as Dr. Roberson.

14

concern that Plaintiff could get into arguments at work. *Id.*

Ms. Wright testified that Plaintiff's other problems that could interfere with his ability to work were his difficulty getting up in the morning, difficulty staying focused, and difficulty understanding instructions from a supervisor. TR 54. Ms. Wright further testified that she had asked Plaintiff what he would do if a supervisor asked him to do something that was not one of his normal duties, and she testified that Plaintiff told her that he would refuse to work and possibly walk out on his job. TR 55. Ms. Wright stated that she thought that Plaintiff could maintain a job where someone was constantly supervising him. *Id.* Ms. Wright stated that she did not think Plaintiff would be able to obtain such a job unless he went to a sheltered workshop or vocational school. *Id.*

Ms. Wright reported that Plaintiff was "in denial to a point" with regard to his limitations. TR 55. Ms. Wright further stated that Plaintiff hated the problems he had, and that he wished he could be like everyone else. *Id.*

Ms. Wright acknowledged that Plaintiff had a normal I.Q., but that Plaintiff's main problems were paying attention, focusing, and "processing." TR 56.

Ms. Wright stated that Plaintiff had taken Ritalin, but that the medicine gave him stomach aches and made it difficult for him to sleep. TR 56. Ms. Wright reported that for these reasons, she and Plaintiff's doctor decided to discontinue Plaintiff's Ritalin. *Id.* Ms. Wright testified that when people stopped taking Ritalin, they typically became mean and agitated. TR 56-57. Ms. Wright testified that Plaintiff was "real hateful, and that's not even his personality." TR 56-57.

Ms. Wright reported that Plaintiff had a vision problem, but that his contact lenses

resolved this problem.  TR 57.  Ms. Wright further reported that Plaintiff had fractured his ankle, and that Plaintiff's foot continued to be problematic.  *Id.*

Ms. Wright testified that Plaintiff did not do many chores around the house, and that he did not "keep his room straight."  TR 57.  Ms. Wright added that Plaintiff and his brother did not keep sheets and pillowcases on their beds, and that their room was cluttered.  *Id.*  Ms. Wright stated that Plaintiff and his brother would occasionally shove things in the closet and under their beds to create the appearance that they had cleaned their room.  TR 58.  Ms. Wright reported that she had to thoroughly clean Plaintiff's room for him.  *Id.*

Ms. Wright reported that one of Plaintiff's chores was to keep his room clean, and that his other chores included washing dishes and doing yard work.  TR 58.  Ms. Wright further testified that whenever she gave Plaintiff a chore to do, someone needed to "stand there and watch to see it done, you know, properly."  *Id.*  Ms. Wright stated that most of the time she did not supervise Plaintiff and his brother, but that she knew she would have to "come back behind them."  *Id.*

Ms. Wright testified that both Plaintiff and his brother had reading problems, and that neither of them could spell.  TR 58.  Ms. Wright stated that a doctor found that Plaintiff read at the second grade level.  *Id.*  The ALJ mentioned another set of test results that showed that Plaintiff read at the fourth and fifth grade level.  TR 59.  Ms. Wright added that this test showed that Plaintiff's language skills were at a third grade level.  *Id.*  Ms. Wright further added that Plaintiff's reading problems were the reason that he was in a "resource class."  *Id.*  Ms. Wright stated that reading and language would be a problem for Plaintiff, and that he struggled with reading comprehension.  TR 59-60.

16

### D. Testimony of Plaintiff's Sister

Angela Fitzpatrick, Plaintiff's sister, also appeared and testified at the hearing. TR 60-63.

Ms. Fitzpatrick testified that she used to "do childcare," and that she was in school at "Nashville Tech." TR 60. Ms. Fitzpatrick stated that she did not live at home, and that she saw Plaintiff every other week. *Id.* Ms. Fitzpatrick stated that she probably stopped living at home sometime in 1996. TR 60-61.

Ms. Fitzpatrick stated that Plaintiff "likes to pace the floor a lot" and that she did not understand why he walked around so much. TR 61. Ms. Fitzpatrick added that Plaintiff occasionally visited her in her home. *Id.* Ms. Fitzpatrick reported that she let Plaintiff babysit her daughter only when their mother was also present. *Id.* Ms. Fitzpatrick added that Plaintiff "ain't too fond of [babysitting]." *Id.*

Ms. Fitzpatrick testified that she also had Plaintiff's "comprehension" problem, and that it was interfering with her education. TR 61. For this reason, Ms. Fitzpatrick stated that she thought Plaintiff would have trouble working. TR 61-62. The ALJ then asked Ms. Fitzpatrick about "menial jobs." TR 62. Ms. Fitzpatrick stated that "my brothers couldn't even cut my grass right," adding that it once took them three hours to cut her grass. *Id.*

Ms. Fitzpatrick testified that Plaintiff heard people say things, but that what people said "doesn't register" in his brain "until a little while longer." TR 62. Ms. Fitzpatrick stated that she had told Plaintiff to do things, and that he had forgotten the instructions she had given him. *Id.*

Ms. Fitzpatrick stated that Plaintiff was physically strong and that he could do physical work, but "with the brain too, no." TR 63.

Ms. Fitzpatrick added that Plaintiff wanted to be "normal." TR 63.

### E.  Testimony of Plaintiff's Twin Brother

Donnell Wright, Plaintiff's brother, also appeared and testified at the hearing.  TR 63-67.

Mr. Wright testified that he was a senior at Maplewood High School, and that he was in some of the same classes as Plaintiff.  TR 64.  Mr. Wright stated that Plaintiff did his schoolwork, but that he had difficulty reading because of his disability.  *Id.*  Mr. Wright stated that their school gave them extra time to complete assignments.  *Id.*  Mr. Wright added that he and Plaintiff had to ask their teacher to explain things to them.  *Id.*

Mr. Wright stated that Plaintiff "walks okay," but that Plaintiff walked differently after he broke his ankle. TR 65.  Mr. Wright reported that "you can tell it was broke."  *Id.*  Mr. Wright stated that he was not aware of any other physical problems that Plaintiff might have had. *Id.*

Mr. Wright reported that he and Plaintiff were impulsive, and that they "jump in head first."  TR 65.  Mr. Wright added that he and Plaintiff did not "process" things, and that they did not take time to sit down and think before they acted.  *Id.*  Mr. Wright stated that this behavior came with consequences.  *Id.*

Mr. Wright stated that he and Plaintiff did many things together and that they were very close.  TR 65-66.  Mr. Wright specified that he and Plaintiff played sports and video games together, that he and Plaintiff played basketball at Vanderbilt University every three weeks, and that he and Plaintiff had played football once earlier in the year.  TR 66.  Mr. Wright also stated that he, Plaintiff, and their friend, Jonathan, went to Vanderbilt University to play basketball and lift weights.  *Id.*  Mr. Wright stated that he and Plaintiff did not go out on dates, but that they

18

went bowling on Sundays with friends.  TR 66-67.

### F.  Vocational Testimony

Vocational Expert ("VE"), Jane Brenton, also testified at Plaintiff's hearing.  TR 67-69.
The ALJ noted that Plaintiff had no past relevant work.  TR 67.

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and
asked if work would be available for the hypothetical claimant.  TR 67.  The VE answered that
in the State of Tennessee, there are approximately 3,200 hand packer positions at the medium
exertional level, 5,100 hand packer positions at the light exertional level, 42,000 janitorial
positions at the medium exertional level, 3,600 janitorial positions at the light exertional level,
6,000 dish washer positions at the medium exertional level, and 2,100 dish washer positions at
the light exertional level, all of which would be appropriate for the hypothetical claimant.  TR
68.

The ALJ then modified the hypothetical to include Plaintiff's limitations "on maintaining
– on understanding and remembering and carrying out detailed instructions."  TR 68.  The VE
responded that these additional limitations would have no impact on the availability of the stated
positions.  *Id.*

The ALJ then asked the VE, "If given full credibility, would there be work for such a
person?"  TR 68.  The VE responded that if Plaintiff's complaints were found to be fully
credible, there would be no work available.  *Id.*

### III.  CONCLUSIONS OF LAW

### A.  Standards of Review

This Court's review of the Commissioner's decision is limited to the record made in the

administrative hearing process. *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991). The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision. *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion." *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). If the Commissioner, however, did not consider the record as a whole, the Commissioner's conclusion is undermined. *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence: (1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age,

education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

**B.  Proceedings At The Administrative Level**

The claimant carries the ultimate burden to establish an entitlement to benefits.  *See, e.g.,* 42 U.S.C. § 1382c.  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 provides that an individual under the age of eighteen (18) is considered disabled for purposes of eligibility for disability benefits "if that individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c.

At the administrative level of review, a minor claimant's case is considered under a three-step sequential evaluation process as follows:

> (1)  If the claimant is engaging in substantial gainful activity, benefits are automatically denied.
>
> (2)  If the claimant is not found to have a medically determinable impairment or combination of impairments which is/are severe and which is/are expected to result in death or lasted or is/are expected to last for a continuous period of not less than twelve (12) months, then he or she is not disabled.
>
> (3)  If the claimant's impairment or combination of impairments does not meet, equal or functionally equal a listing, the child is not disabled.  If, however, the claimant's impairment(s) results in "marked and severe functional limitations," it is functionally equal to the "Listing of Impairments" in Appendix 1, Subpart P, Part 404.  (*See* 20 C.F.R.§ 416.902.)  If the impairment(s) does not meet, equal or otherwise result in "marked and severe functional limitations," the child is not disabled.

20 C.F.R. § 416.924.

For purposes of determining functional equivalence, a child who has "marked

limitation"[5] in two areas of development or functioning, or "extreme limitation"[6] in one area, has an impairment that is functionally equivalent in severity to the required Listing.  20 C.F.R. § 416.926a(c).  No single piece of information taken in isolation, however, can establish whether a child has a "marked" or an "extreme" limitation.  20 C.F.R. § 416.926a(e)(4)(i).  Rather, when making a disability determination, the ALJ must consider all relevant medical and non-medical information.  *See* 20 C.F.R. §§ 416.924a (*i.e.*, medical evidence, school performance, test scores, parental information, etc.), 416.924b (*i.e.*, age), and 416.929 (*i.e.*, symptoms and pain).  The ALJ must additionally evaluate the effects of a child's impairment(s) on his or her functioning.[7]

### C.  Plaintiff's Statement Of Errors

Plaintiff submitted a "Brief," which states in its entirety:

<u>Brief</u>

Plaintiff agree [*sic*] to a motion for judgment based upon the Administrative record is appropriate and is necessary for The Magistrate Judge's Report and Recommendation.

Plaintiff pledges for judgment base [*sic*] on the transcript of the entire record and tape recordings.

Plaintiff is not able to address,

---

[5] "Marked limitation" is a limitation that is "more than moderate," but "less than extreme."  20 C.F.R. § 416.926a(e)(2)(i).  A "marked limitation" may arise when several activities or functions are limited, or when one activity or function is limited, as long as the limitation seriously interferes with the child's functioning.  *Id.*

[6] "Extreme limitation" is a limitation that is "more than marked," but does not necessarily mean a total lack or loss of ability to function.  20 C.F.R. § 416.926a(e)(3)(i).  "Extreme limitation" arises when the impairment(s) interferes very seriously with the child's ability to independently initiate, sustain, or complete activities.  *Id.*  A child's day-to-day functioning may be very seriously limited when the impairment(s) limits only one activity or when the interactive and cumulative effects of the impairment(s) limit several activities.  *Id.*

[7] *I.e.*, (1) how well the child can initiate and sustain activities; how much extra help the child needs, and the effects of structured or supportive settings (*see* § 416.924a(b)(5)); (2) how the child functions in school (*see* § 416.924a(b)(7)); and (3) the effects of the child's medications or other treatment (*see* § 416.924a(b)(9)).

Case 3:03-cv-00839   Document 16   Filed 07/11/05   Page 22 of 25 PageID #: 22

A.  Statement of the case
B.  Statement of Errors
But beseech The Magistrate Judge to read the transcript and make a fair judgment in the case.  If your judgment is a favorable decission [*sic*].  Plaintiff seeks a reversal in judgment.

Docket Entry No. 14.  Because Plaintiff is *pro se*, the Court has liberally construed Plaintiff's "Brief" to find that Plaintiff essentially argues that the ALJ's decision was not supported by substantial evidence.  Accordingly, the Court concludes that Plaintiff argues, pursuant to 42 U.S.C. § 405(g), that the Commissioner's decision should be reversed.  *Id.*

Sentence four of § 405(g) states as follows:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. §§ 405(g), 1383(c)(3).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

As has been noted, Plaintiff essentially contends that the ALJ's decision was not supported by substantial evidence.  Docket Entry No. 14.

As explained above, "substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion,"  *Her*, 203 F.3d at 389

Case 3:03-cv-00839   Document 16   Filed 07/11/05   Page 23 of 25 PageID #: 23

(*citing Richardson*, 402 U.S. at 401), and has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance." *Bell,* 105 F.3d at 245 (*citing Consolidated Edison Co.,* 305 U.S. at 229).

The record in the case at bar is replete with doctors' evaluations, medical assessments, test results, and the like, all of which were properly considered by the ALJ in his decision, and all of which constitute "substantial evidence." *See, e.g.*, TR 16; 17; 18. Additionally, the ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff, his mother, his brother, his sister, and the VE. TR 19; 20. While it is true that some of the testimony and evidence supports Plaintiff's allegations of disability, it is also true that much of the evidence supports the ALJ's determination that Plaintiff's disability ceased as of April 2001. TR 21.

As has been noted, the reviewing court does not substitute its findings for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences. *Garner*, 745 F.2d at 387. In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached. *Her*, 203 F.3d at 389 (*citing Key*, 109 F.3d at 273). The ALJ's decision was properly supported by "substantial evidence;" the ALJ's decision, therefore, must stand.

## IV. RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it

Case 3:03-cv-00839   Document 16   Filed 07/11/05   Page 24 of 25 PageID #: 24

with the District Court.  Any party opposing said objections shall have ten (10) days from receipt

of any objections filed in which to file any responses to said objections.  Failure to file specific

objections within ten (10) days of receipt of this Report and Recommendation can constitute a

waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466,

88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).


E. CLIFTON KNOWLES
United States Magistrate Judge